Filed 6/25/13  P. v. Vasquez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E053755 |
| v. | (Super.Ct.No. FWV902589) |
| CRUZ RODRIGUEZ VASQUEZ et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Shahla Sabet, Judge.  Affirmed as modified.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant Cruz Rodriguez Vasquez.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant Jose Antonio Rivera.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Jose Antonio Rivera of 27 counts of second degree robbery (counts 1-8, 10, 15, 17-26, 28, 29, 33, 37-40—Pen. Code § 211),[1] eight counts of attempted second degree robbery (counts 9, 11, 14, 27, 32, 34-36—§§ 664, 211), and found true 31 allegations that he personally used a handgun in the attached counts (§ 12022.5, subd. (a)).[2] Another jury convicted defendant and appellant Cruz Rodriguez Vasquez of 22 counts of second degree robbery (counts 3-6, 8, 10, 15, 18-24, 26, 28, 29, 33, 37-40—§ 211), six counts of attempted second degree robbery (counts 9, 11, 27, 34-36), and found true 25 allegations a principal was armed with a handgun in the attached counts (§ 12022, subd. (a)(1)).[3]

The court sentenced Rivera to an aggregate term of 86 years, 8 months' incarceration. It sentenced Vasquez to a total term of 39 years' imprisonment.

On appeal Rivera challenges the sufficiency of the evidence on the true finding that he personally used a handgun with respect to count 38, the lawfulness of the term imposed on count 34, and maintains the abstract of judgment does not accurately reflect the custody credits awarded on the date of his conviction. Vasquez contends insufficient evidence supports his conviction of attempted robbery on count 36 because one of the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The jury also found not true allegations Rivera personally used a handgun in counts 14 and 33. The People earlier dismissed counts 12, 13, 16, and 30. It also dismissed the personal use allegations attached to counts 17 and 34; and that a coparticipant was armed, attached to counts 17 and 34.

[3] The jury deadlocked on counts 1, 2, 7, 14, 17, 25, 32 and the allegations attached to counts 21 and 22; therefore, the court declared a mistrial as to those counts and allegations.

complaining witnesses was not administered the oath before testifying, the court erroneously failed to instruct on the lesser included offense of attempted grand theft on count 9, and the People's failure to disclose a pending felony charge against one of its witnesses violated *Brady*[4] and deprived him of his constitutional right to confrontation. Defendants join in each others' arguments. We shall direct the superior court to modify and correct the sentencing minute order and abstract of judgment with respect to Rivera. In all other respects, we affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

On June 8, 2009, at 9:30, Guadalupe Bracamontes was working at Taqueria Tamazulena, when defendants came in. Vasquez stayed by the door on his cell phone while Rivera ordered tacos. When Bracamontes told Rivera the total, Rivera handed her a paper reading that "it was a robbery and that it was best that [she] cooperated with them and to put all the money in the bag that they had"; Rivera lifted up his shirt to show her his gun, said he had a gun, gave her a black plastic bag, and told her to give him all the money; she did so.

On June 12, 2009, at 7:20 p.m., Norma Garcia was working at Mundo Musical Metro PCS in Ontario with her supervisor Oralia Marquez. Defendants walked in together. Rivera walked up and asked Marquez "to put the money in the bag that he had with him." Marquez put the money in the bag and handed it to him. Rivera then pulled up his shirt, showed his gun to her, and told her they should not call the police because

---

[4] *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

3

"they knew who we were and they knew where we lived." The People played a video of the robbery during trial.

On June 14, 2009, at 5:30 p.m., Azucena Sanchez was working at Tropical Island Fruit in Ontario with her coworker, Viky Laura Dorado. Vasquez came in, purchased a drink from Dorado, and walked out. Rivera entered the store as Vasquez left. Rivera lifted up his shirt to show a gun at his waist and asked Sanchez for the money in the register; Vasquez reentered the store. Dorado gave Rivera the money from one cash register and Sanchez gave Vasquez the money from a second cash register. The People played a video of the robbery during trial.

On June 23, 2009, at 4:30 p.m., Obdulia Hernandez was working at an ARCO gas station in Ontario. Rivera walked up to her cash register, lifted up his shirt to reveal a gun, told her to open the cash register, and told Vasquez to get all the money; Vasquez came to her cash register and took the money. Rivera told her not to call the police because he knew where she lived and he could go look for her. The People played a video of the robbery during trial.

On July 17, 2009, at 5:00 p.m., Carmen Valadez was working at Aloha Barbeque Grill. Defendants walked up to her at the cash register. Vasquez asked her to give him change for a dollar. She turned around to open the register and both Vasquez and Rivera came around the counter beside her. Vasquez asked for the money in the drawer; Rivera lifted his shirt and showed her a gun. Vasquez took the money from the drawer and placed it in a black plastic bag. Rivera told her not to call anyone as they left.

4

On July 17, 2009, at 3:30 p.m. Jemima Corona, Guadalupe Rivas, and Blanca Lucero were working at Lucy's Salon, a beauty shop. Martin Gomez was waiting to get his hair cut. Refugio Calderon had already received a haircut and was waiting for his friend. Juan Carlos Gonzalez Martinez was there with his two children. Defendants walked in. Vasquez told the cashier to give him all the money in the register. Rivera pulled a gun from his waistband.

Rivera told Gomez to empty all the money he had in his pockets. Gomez told him he didn't have any money; Gomez pulled out his wallet to show him; nothing was taken from him. Rivera told Calderon to give his money to Vasquez; Rivera gave Vasquez $20. Vasquez told Martinez to give him his money; he did so. Vasquez asked Rivas for her money; she did not have any to give him. Rivera collected money from Rivas's client. Vasquez asked Lucero for her money, but she told him she did not have any. Vasquez put all the money he collected in a small plastic bag. Vasquez said that no one should call the police because they knew where everyone lived and if they called, defendants would go to their homes.

On July 20, 2009, at 4:30 p.m., Monirul Haque was working at Red Hill Gas Station in Rancho Cucamonga. Defendants came into the store. Rivera came behind the register, removed a gun from his waist, and pointed it at Haque's neck. Rivera told him to give him the money in the register. Vasquez told him to put the money in their bag. He took the money out of the cash register and put it in the bag. Vasquez told him not to call the police because he knew where Haque lived. The People played a video of the robbery during trial.

5

On July 27, 2009, Alejandra Gomez was working at a Chevron Gas Station in Claremont at 2:30 p.m. Vasquez walked up to her and told her to put all the money in the cash register into a bag he was carrying. After Vasquez asked for the cash, Gomez looked over and saw Rivera was standing next to her brother, Juan Carlos Gomez, who also worked at the gas station; Rivera pointed a gun at the ground. Alejandra opened the cash register and gave Vasquez all the money inside.[5] Vasquez also asked for two packs of cigarettes. After she handed them over, Rivera told her to put up her arms and stand with her brother. Rivera told them not to call the police because they knew where they lived. The People played a video of the robbery during trial.

On August 4, 2009, Yessica Contreras was working at Zapp Wireless in Upland. Defendants entered the store together. Rivera lifted up his shirt and showed her a gun at his belt. They told her to open the register. Vasquez removed the money from the register and placed it in a bag he had. Contreras was told to go into the restroom and not come out.

On August 9, 2009, at 2:20 p.m., Francisco Abril was working at a Metro PCS store on West Philadelphia Street in Ontario with Genesis Mireles. Defendants walked into the store. Rivera pulled out a gun from his waist. He pointed it directly at Abril. Rivera told him to give Rivera the money from the register. Vasquez pulled out a bag. Vasquez started grabbing the cash out of the register after Abril opened it. Vasquez told

---

[5] For clarity and convenience, we refer to the victims of the Chevron robbery by their first names. We do not intend this informality to reflect a lack of respect.

them to lock themselves in the restroom and not to call the police or they would go to their homes and kill them.

On August 16, 2009, at 2:45 p.m., Karina Jara was working at a Metro PCS store on Central Avenue in Montclair with Arturo Gonzalez. Defendants walked into the store. Rivera came behind the counter and told Jara to open the register and give him the money. Vasquez acted as a lookout. Rivera had his hand by his waist. She told him she didn't have the key; the manager had it. Rivera told her to get the manager. As she opened the back door, Rivera pulled out a gun from his waist and placed it on her waist. She asked Gonzalez to open the resister. Rivera cursed, pointed the gun directly at Gonzalez, and told him to open the register. Gonzalez came out and opened the register. Vasquez came around the counter, retrieved the cash, and put it in a bag. Rivera told them to go into the restroom, walked them back with the gun in his hand, and told them to stay inside. The People played a video of the robbery during trial.

On August 16, 2009, Ivette Siqueiros was working at a Metro PCS store on Valley Boulevard in Fontana with her supervisor Jose Sanchez. Defendants walked in. Rivera walked behind the counter, told Siqueiros to move away, told Sanchez not to move; Rivera had a gun in his belt. Vasquez came up with a black bag and told Sanchez to empty the money from the register into it. Sanchez did so. Rivera told them to go in the back for five minutes and not call the police because they knew where they lived and would do something to them. The People played a video of the robbery during trial.

On August 21, 2009, at 5:00 p.m., Hector Funes was working at a Metro PCS store on Holt Boulevard in Montclair with Adan Pereschica. Defendants walked in together.

7

Vasquez pulled out a black bag and demanded the money from the register. Rivera pulled up his shirt, pulled out a gun, and pointed it at them. Funes opened the cash register and let Vasquez take the money. Vasquez asked each of them for their wallets; they showed them to him; neither of them had any money. Vasquez told them not to call the police because they would be watching them. Rivera took them to the back where he closed the door on them. The People played a video of the robbery during trial.

On August 30, 2009, Juan Devis was working at a Metro PCS store located at 931 West Holt Boulevard in Ontario at 2:00 p.m. with two female employees. The women came into the back room and told him someone was looking for him. He went out onto the sales floor where he saw defendants. Vasquez pulled out a bag and said to put the money from the register in the bag. Rivera lifted up his shirt to show him a gun. Devis put the money in the bag. Rivera told them to go into the back room; they did so. The People played a video of robbery during trial.

On September 18, 2009, at 2:00 p.m., Juan Devis was working at a different Metro PCS store located at 326 East Holt Boulevard in Ontario. Defendants walked in. Devis immediately recognized them. Devis took a customer outside with him. Vasquez signaled him to come back into the store. Devis called 911. Rivera was trying to fix what looked like a gun under his shirt. Defendants then left together. The People played a video of the attempted robbery during trial.

On September 18, 2009, at 2:30 p.m., Isabel Gonzalez was working at the Metro PCS store on Sierra Avenue in Fontana with her district managers Hector Ortiz and Juan Caratachea. She was already aware that other Metro PCS stores had been robbed; she

8

had watched videos of the robberies. She saw defendants enter the store. Gonzalez immediately recognized them from the videos and walked to the back room where her managers were. Gonzalez told Ortiz and Caratachea that suspicious persons were on the sales floor. She and her managers walked back out onto the sales floor. Rivera came around the counter; he lifted his shirt to show a gun tucked into his waistband. Vasquez told Gonzalez to put the cash from the register in a bag he gave her; she did so. Rivera asked Caratachea and Ortiz for their money; Ortiz pulled out his wallet to show Rivera he did not have any money. Rivera escorted them to the back, told them not to come out, and not call the police for five minutes or he would shoot them. The People played a video of the robbery during trial.

On September 18, 2009, Miguel Garcia was shopping at the Metro PCS on Sierra Avenue in Fontana. Defendants walked in. The employee at the counter walked to the back of the store; defendants followed her. Rivera lifted his shirt to reveal a firearm in his waistband. Vasquez asked the employee for the money in the register; she opened the drawer. He pulled out a black bag and she gave him the money. Vasquez told Garcia and the other customers to stay in the corner; then he asked them for their money. Garcia did not give them any; he told them all he had was his debit card. Vasquez then escorted everyone into the restroom in the back.

On September 30, 2009, at 1:45 p.m. Carmen Devey was at her A&A Cellular and Accessories Store in Ontario with a customer named Cesar Gertrudis. Defendants walked into the store. Devey immediately recognized defendants from a flyer a police detective had shown her as individuals who had robbed a number of stores. Vasquez

9

pulled out a bag and told her to put all the money in it.  Rivera lifted his shirt to show her a gun at his waist.  She handed over the money.  Rivera told Gertrudis to get on his knees.  Rivera then took Gertrudis's money.  Rivera told Devey to go in the back room; she did so.  The People played a video of the robbery during trial.

On September 30, 2009, at 2:00 p.m., Edith Rebollar was working at Discoteca Mama Rumba which sells phones, music, and rents movies.  Defendants walked in together.  Vasquez asked Rebollar for the money in the register.  Rivera lifted his shirt and showed her a gun.  Rebollar gave Vasquez the money from the register.  Vasquez then told her to go the bathroom and wait five minutes; he said if she left they would shoot her.  The People played a video of robbery during trial.

Ali Ferdaous, the owner of a Metro PCS store named Zapp Wireless in Upland testified that when the store was initially robbed on August 4, 2009, there were no video cameras.  He added them thereafter.  On October 8, 2009, at 5:00 p.m., he was working at the store when Rivera walked in.  Rivera told him it was a holdup and showed him a gun at his belt.  Rivera then pulled the gun out and pointed it at him and a customer.  Vasquez then walked in.  Ferdaous was told to open the cash register; he did so.  He was then told to move away from the register; Vasquez took the money from the register and put it in a black bag. Defendants left.  Ferdaous hit a panic button, which called the police.  Within 40 minutes of the robbery, he was taken by the police to a location within two miles of the store where he identified defendants.  The People played a video of the robbery during trial.

10

Upland Police Officer Maurice Duran was out on patrol on October 8, 2009, at 5:14 p.m. when he heard a dispatch that a robbery had just occurred. He knew the type of vehicle the robbers had been using from previous reports; he saw a vehicle matching its description and the driver, Vasquez, matching the description of one of the suspects. Officer Duran let dispatch know he had found a possible match of the vehicle and suspects. He maneuvered his vehicle behind Vasquez's and initiated a traffic stop. The car immediately pulled over. Officer Duran pulled out his weapon, told the occupants to put their hands on their heads, and waited for more officers to arrive. After several more officers arrived, they ordered the occupants out one by one. Vasquez told one of the officers a gun was under the front passenger seat of the vehicle. Under the front passenger seat, Ontario Police Detective Jason Langford found a black plastic bag containing $225, and an operable, black .45-caliber semiautomatic Colt handgun with two rounds in the magazine.

Ontario Police Detective Roger Planas testified before Vasquez's jury that during a video-recorded interview, Vasquez admitted robbing the following locations with Rivera, while the latter was armed: Zapp Wireless (count 40); two Metro PCS stores in Fontana (counts 23-24, 33-36); two Metro PCS stores in Montclair (counts 25-26, 27-28); a Chevron Gas Station in Claremont (counts 18-19); Discoteca Mama Rumba in Pomona (count 39); three Metro PCS stores in Ontario (counts 21-22, 29, 32); A&A Cellular in Ontario (counts 37-38); and the Red Hill Gas Station in Rancho Cucamonga (count 17). Vasquez admitted driving the getaway car in most of the robberies. He said the gun was

11

a .45-caliber, which belonged to Rivera and was used by Rivera during the robberies; Vasquez denied ever being armed. Vasquez wrote an apology letter to the victims.

Detective Planas also testified before Rivera's jury that during his interview with Rivera, Rivera admitted being armed with the .45-caliber handgun during the robberies of Zapp Wireless (counts 20, 40), Aloha Grill (count 7), Lucy's Beauty Salon (counts 8-11, 14-15), Red Hill Gas Station (count 17), Taqueria Tamazulena (count 1), Mundo Musical (counts 2-3), Islas Tropical Fruit (counts 4-5), and Arco (count 6). Rivera said his role in the robberies was to be armed while Vasquez's was to obtain the money. Rivera then informed Detective Planas he no longer wished to answer further questions.

## DISCUSSION

A.  RIVERA:  SUFFICIENCY OF THE EVIDENCE TO SUPPORT PERSONAL USE OF A FIREARM ENHANCEMENT ON COUNT 38

Rivera contends the evidence is insufficient to support the true finding on the personal use enhancement with respect to his robbery of A&A Cellular. We disagree.

"'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations.

12

[Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.' [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

"Proof of firearm use during a felony does not require a showing the defendant ever fired a weapon. 'Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct *which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies.* "Use" means, among other things, "to carry out a purpose or action by means of," to "make instrumental to an end or process," and to "apply to advantage." (Webster's New Internat. Dict. (3d ed.1961).) The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that 'uses' be broadly construed." [Citation.] 'Thus when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure. The defense may freely urge the jury not to draw such an inference, but a failure to actually point the gun, or to issue explicit threats of harm, does not entitle the defendant to a judicial exemption from section 12022.5[, subdivision] (a).' [Citations.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 806-807.)

13

"Indeed we believe a gun use enhancement would be wholly warranted if the defendant deployed a gun to further the holdup of a blind person—even if the victim never learned of the gun's presence. As another court said with respect to the offense of publicly exhibiting a firearm in a rude or offensive manner, 'The thrust of the offense is to deter the public exhibition of weapons in a context of potentially volatile confrontations. The victim's unawareness of the weapon does little to mitigate the danger inherent in such situations.' [Citation.]" (*People v. Granado* (1996) 49 Cal.App.4th 317, 329, fn. 10.)

Here, at a minimum, circumstantial evidence supports the true finding on the gun use enhancement. Devey testified Rivera lifted his shirt to show her a gun at his waist while she was with her customer, Gertrudis. She then complied with Vasquez's demand that she put all the money in the register into his black bag. Rivera told Gertrudis to get on his knees and then took Gertrudis's wallet with all his money. Gertrudis testified he was "a little" afraid. It is reasonable to infer from the circumstances that Gertrudis saw the gun simply due to his proximity to Devey when she saw the gun. Moreover, it is likewise reasonable to infer Gertrudis saw the gun due to his compliance with Rivera's requests that he get on his knees and surrender his wallet. Furthermore, that fact that Gertrudis was afraid also lends credence to the inference he saw the gun. Finally, it appears from the video surveillance of the robbery that Gertrudis was looking directly at Rivera when he lifted his shirt to expose the gun. From the video one can see that Gertrudis was in close proximity to Rivera both while Gertrudis was on the sales floor

14

and when he was later moved behind the counter.  Thus, substantial evidence supported the true finding on the gun use enhancement with respect to the robbery of Gertrudis.

      B.       <u>VASQUEZ:  SUFFICIENCY OF THE EVIDENCE TO SUPPORT</u>

             <u>CONVICTION FOR ATTEMPTED ROBBERY ON COUNT 36</u>

Vasquez essentially argues Ortiz's testimony must be disregarded because the Court failed to administer the oath before he testified.  As such, Vasquez maintains the evidence that remains is insufficient to support his conviction for the attempted robbery of Ortiz.  We disagree.  We hold Vasquez forfeited the issue by failing to object.  Moreover, we hold any error was harmless because sufficient evidence supported the conviction.

Evidence Code section 710 requires that "Every witness before testifying shall take an oath or make an affirmation or declaration in the form provided by law . . . ."  "'[U]nsworn testimony does not constitute "evidence" within the meaning of the Evidence Code.'  [Citations.]"  (*People v. White* (2011) 191 Cal.App.4th 1333, 1340.)

Nevertheless, Vasquez did not object to the court's failure to administer the oath to Ortiz prior to his testimony.  "[W]e find that if a witness is permitted to testify without having taken the appropriate oath, the defect must be timely noted and failure to do so constitutes a [forfeiture].  [Citations.]"  (*People v. Carreon* (1984) 151 Cal.App.3d 559, 579-580; *People v. Haberlin* (1969) 272 Cal.App.2d 711, 716; *In re Da Roza's Estate* (1947) 82 Cal.App.2d 550, 555-556.)  Thus, Vasquez forfeited the issue by failing to object below.

15

Vasquez maintains that even if he forfeited the claim, his counsel below was constitutionally ineffective for failing to object. "'The law governing defendant's claim is settled. "A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions. [Citations.] 'Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance.'" [Citation.] It is defendant's burden to demonstrate the inadequacy of trial counsel. [Citation.] [The court has] summarized defendant's burden as follows: "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" [Citation.] [¶] Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [Citation.]' Defendant's burden is difficult to carry on direct appeal, as we have observed: "'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.'" [Citation.]' [Citation.] If the record on appeal ""'sheds no light on why counsel acted or

16

failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected,"' and the 'claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.' [Citation.]" (*People v. Vines* (2011) 51 Cal.4th 830, 875-876.)

First, although counsel's performance was deficient because there could be no strategic or tactical reason not to object, we are at a loss to see how Vasquez was prejudiced, because he has failed to show how the outcome of the proceeding would be any different. Vasquez implies Ortiz's testimony would be completely different had he been required to take the oath; however, Vasquez offers no proof of such. Such "proof" would be more properly handled in a habeas corpus proceeding with an attached declaration under penalty of perjury from Ortiz establishing such.

Second, a video was played to the jury that showed the entire robbery from two angles. We see Rivera and Vasquez enter the store. Vasquez approaches Gonzalez. Gonzalez then leaves the sales counter for the back room. She returns with Ortiz and Caratachea. Rivera begins to move around the counter and lifts his shirt just as Ortiz arrives on the sales floor. Ortiz immediately puts his hands up. Rivera directs Ortiz and Caratachea to move to the corner closest to Rivera. Rivera points directly at Ortiz; Ortiz responds by putting his hands up again. Ortiz then removes his wallet to show there is no cash inside.

Third, from the testimonies of both Gonzalez and Caratachea that defendants asked them both for their money, it is rationally inferable they did so with respect to

17

Ortiz. Fourth and finally, Vasquez confessed to the robbery at the Metro PCS on Sierra in Fontana on September 18, 2009. Thus, Vasquez suffered no prejudice because substantial evidence outside of Ortiz's testimony established defendants attempted to rob Ortiz.

      C.      VASQUEZ: *BRADY* ERROR

Vasquez contends he was deprived of his constitutional right to confrontation of a witness because evidence that Mireles had a pending charge against her in the same court, which could have been used to impeach her, was not discovered until after Mireles's testimony. Moreover, he argues the court's later decision that it would have excluded such evidence under Evidence Code section 352 amounted to an abuse of discretion. Thus, he maintains his conviction on count 22 for second degree robbery must be reversed due to *Brady* and evidentiary error. We disagree.

On March 30, 2011, after the People and Rivera had rested their cases, Vasquez made an oral motion for dismissal of count 22, because the People had failed to disclose Mireles had a pending felony case before the court. On April 4, 2011, Vasquez filed a motion for mistrial as to count 22 alleging *Brady* error in the People's failure to disclose Mireles's pending felony case. Counsel for Rivera had evidently discovered on his own that Mireles was on the criminal calendar in that court for felony grand theft charges with respect to her employment at Metro PCS.

At a hearing on the matter on April 4, 2011, the court denied Vasquez's motion reasoning it would not have let the evidence be admitted at trial pursuant to Evidence Code section 352 even if it had been timely disclosed. "[I]t will not come in for

18

impeachment purposes unless there is a conviction for felony [or] for misdemeanors. . . . [¶] A pending case, whether it's a misdemeanor or a felony, the only way you could impeach the witness would be by bringing that issue and litigating that issue. It will be a trial within a trial. Under [Evidence Code section] 352, I [would] not have allowed it had you known . . . ." "[T]his individual is still not convicted of anything. It's just an accusation. [¶] . . . [U]nder [an Evidence Code section] 352 analysis and lack of conviction of a moral turpitude crime, would be also denied, your request for dismissal of that count." "The court refuses to extend the obligation of the DA's office to cross-check, to disclose any pending cases for a possible impeachment. Because a pending case is not . . . Brady material. A conviction is. The pending case may be useful for the defense if under [Evidence Code section] 352, the court allows impeachment on a pending case based on a bad act, moral turpitude prior act. . . . [¶] The court [would] not have allowed that impeachment to occur because it [would] be a trial within a trial."

"'The federal due process clause prohibits the prosecution from suppressing evidence materially favorable to the accused. The duty of disclosure exists regardless of good or bad faith, and regardless of whether the defense has requested the materials. [Citations.] The obligation is not limited to evidence the prosecutor's office itself actually knows or possesses, but includes "evidence known to the others acting on the government's behalf in the case, including the police." [Citation.] [¶] For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness. [Citations.] Evidence is material if there is a reasonable probability its disclosure would have altered the trial result. [Citation.]

Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies. [Citations.] Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is reversible without need for further harmless-error review. [Citation.]' [Citation.]" (*People v. Whalen* (2013) 56 Cal.4th 1, 64.)

"[T]hat a prosecution witness faced pending criminal matters, some of which were being prosecuted by the same district attorney's office prosecuting the defendant, constitutes evidence "favorable" to the defense, in that a jury could view this circumstance as negatively impacting the credibility of testimony by the witness that was helpful to the prosecution." (*People v. Letner* (2010) 50 Cal.4th 99, 176 [failure to disclose was not material where witness testimony independently corroborated and witness already pled].) "[A] defendant is entitled to discovery of criminal charges currently pending against prosecution witnesses anywhere in the state. Contrary to the argument of the prosecutor before the trial court, the pendency of criminal charges is material to a witness' motivation in testifying even where no express 'promises of leniency or immunity' have been made. During trial, defense counsel 'is permitted to inquire whether charges are pending against a witness as a circumstance tending to show that the witness may be seeking leniency through testifying. [Citations.]' [Citation.]" (*People v. Coyer* (1983) 142 Cal.App.3d 839, 842 [statutory discovery procedure, remanded to trial court].)

On the other hand, "[I]t is established that evidence of mere arrests is inadmissible because it is more prejudicial than probative. [Citations.]" (*People v. Lopez* (2005) 129

20

Cal.App.4th 1508, 1523; *People v. Anderson* (1978) 20 Cal.3d 647, 650-651 [admission of evidence of codefendant's arrests constituted prejudicial error]; *People v. Medina* (1995) 11 Cal.4th 694, 769 [admission of evidence of the defendant's arrests was harmless error in light of properly admitted evidence of the defendant's extensive criminal record including convictions for 25 felonies].)

"Evidence Code section 352 provides that a court 'in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' We review a trial court's ruling under this section for abuse of discretion and will reverse a trial court's exercise of discretion to admit evidence 'only if "the probative value of the [evidence] clearly is outweighed by their prejudicial effect." [Citations.]' [Citation.]" (*People v. Valdez* (2012) 55 Cal.4th 82, 133.)

"'"[T]he latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." [Citation.]' [Citation.] Regarding constitutional limitations, we have held that '"not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance." [Citation.]' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 374-375.)

21

First, we cannot say the People committed any *Brady* error due to the non-disclosure of Mireles's pending criminal charges. Nothing indicates Mireles had already pled to the charges. The prosecutor noted that she had run Mireles's rap sheet, which disclosed only convictions, not pending charges. Moreover, the record is devoid of any information with regard to when Mireles was charged, i.e., whether it was prior to trial or even after Mireles testified. Likewise, it is not altogether clear how the People would have obtained such information. Furthermore, the evidence was disclosed prior to the conclusion of trial. (*People v. Verdugo* (2010) 50 Cal.4th 263, 282-283 [information disclosed at trial was therefore not suppressed for purposes of *Brady*].)

Regardless, we hold the court acted within its broad discretion in ruling it would have excluded the evidence even if it had been disclosed prior to Mireles's testimony. As noted above, evidence of arrests has little, if any, probative value because it has not been proven the individual has actually done anything wrong, i.e., the lack of a conviction severely reduces its probative value. Moreover, we agree with the trial court such evidence could easily devolve into a mini trial on the witness's guilt on the offense for which she was charged. Vasquez maintains that he "could have introduced the evidence in two sentences." That may be true, but the question is whether he *would have* limited himself to two sentences should the evidence have been deemed admissible. Indeed, the time spent on the issue would largely have been determined by how Mireles answered the questions asked of her. If she posited she had been falsely accused, both defendant and the prosecution would have been likely to delve deeper into the nature of the allegations and the circumstances under which they were made. Thus, the court's conclusion that

22

admission of the evidence could devolve into a trial on the allegations against Mireles, combined with its minimal probative value supports the court's ruling. Therefore, the court acted within its discretion in determining the evidence was inadmissible.

Regardless, even assuming error, it was harmless. (*People v. Hernandez* (2012) 53 Cal.4th 1095, 1108 [*Brady* error reversible only when evidence is "material" and "there is a reasonable probability that, absent the error, the fact finder would have had a reasonable doubt respecting guilt"]; *People v. Moore* (2011) 51 Cal.4th 386, 407, fn. 6 [erroneous Evidence Code section 352 analysis not reversible if harmless beyond a reasonable doubt].) Here, even if the jury were to disregard Mireles's testimony due to her arrest, overwhelming evidence still supported the jury's verdict on count 22. Mireles's coworker, Abril, testified defendants walked into the Metro PCS store in Ontario on August 9, 2009; Rivera pulled a gun from his waist, pointed it at Abril, and asked for the money. Vasquez pulled out a bag and started grabbing cash from the drawer after Abril had opened it. Mireles began panicking and started to cry. One defendant told them both to lock themselves in the restroom and not call the police or defendants would go to their homes and kill them. Abril observed Vasquez had a tattoo of a letter on his neck and later identified both defendants from pictures presented him. Vasquez admitted committing the robbery. Thus, any error was harmless beyond a reasonable doubt.

D. VASQUEZ: FAILURE TO INSTRUCT THE JURY WITH LESSER INCLUDED OFFENSE OF ATTEMPTED GRAND THEFT ON COUNT 9

Vasquez contends the court erred in determining not to instruct the jury sua sponte on the lesser included offense of attempted grand theft with respect to count 9, the attempted second degree robbery of Martin Gomez, because Gomez was not in fear or subjected to force. We disagree.

"'"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." [Citations.] "That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser." [Citations.]' [Citations.] 'Nevertheless, "the existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." [Citation.] Such instructions are required only where there is "substantial evidence" from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense. [Citations.]' [Citation.]" (*People v. Whalen*, *supra*, 56 Cal.4th at p. 68.)

"Theft, in whatever form it happens to occur, is a necessarily included offense of robbery." (*People v. Ortega* (1998) 19 Cal.4th 686, 690, overruled on other grounds in *People v. Reed* (2006) 38 Cal.4th 1224, 1228-1229; *People v. Bradford* (1997) 14 Cal.4th 1005, 1055-1056 ["If intent to steal arose only after the victim was assaulted, the robbery element of stealing by force or fear is absent"].) "Robbery is the felonious taking of

24

personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Property, regardless of value, taken from the person of another without force or fear, is grand theft. (§ 487, subd. (c).)

First, though certainly not dispositive, the court explicitly found instruction with the lesser offense of grand theft inappropriate because Gomez, regardless of whether in fear, was subjected to force by the display of the gun. Both defense counsel below agreed instruction with the lesser included offense of grand theft was inappropriate. Second, Vasquez selectively quotes Gomez's testimony. We quote the colloquy in its contextual entirety:

"[Gomez:] And when they got all the money together, . . . Vasquez says 'Nobody calls the police[.] If you call, we know all of you. We know where you live. If you call them, we're going to go to your houses.'

"[Prosecutor:] And did you believe that to be true?

"[Gomez:] I didn't believe them. I'm not afraid of them.

"[Prosecutor:] Were you scared at the time?

"[Gomez:] Oh, yeah, at that time I was because—

"[Prosecutor:] Because why?

"[Gomez:] Because at the moment [Rivera took] out the gun, there was a man before him, a person. And he pointed to his feet and he said, 'Go over there.' And he didn't listen to him right [a]way. And he said, 'Go over there or I'm going to shoot you.'"

25

Gomez's statement that he was not afraid of defendants was in direct response to their threat, after the robbery had been concluded, to come to his house should he and/or the other victims call the police. Indeed, Gomez testified he was scared at the time of the robbery because Rivera had taken out a gun and threatened another. Thus, there was no evidence that Gomez felt neither force nor fear. On the contrary, Gomez's testimony established conclusively he felt both. Therefore, no evidence supported giving the instruction on the lesser included offense of grand theft. The court acted appropriately in declining to give the instruction.

E.      <u>RIVERA: UNAUTHORIZED SENTENCE ON COUNT 34</u>

Rivera maintains the court imposed an unauthorized term of one year on count 34, when it was limited to the imposition of an eight-month term. The People concede the error, but contend the matter must be remanded for resentencing.

"[I]t is well established that the appellate court can correct a legal error resulting in an unauthorized sentence . . . at any time. [Citation.]" (*People v. Sanders* (2012) 55 Cal.4th 731, 743, fn. 13.)

When sentencing Rivera on count 34, the court referred to the conviction as one for second degree robbery, when Rivera had actually been convicted only of *attempted* second degree robbery. The court imposed a consecutive term of one third the middle term of three years, or one year; the punishment for second degree robbery. (§ 213, subd. (a)(2).) The punishment for attempted second degree robbery is 16 months, two years, or three years. (§§ 18, 213, subd. (a)(2)(b).) When imposing sentence on Vasquez on count 34, the court correctly labeled the offense as attempted second degree robbery and

26

imposed a consecutive authorized sentence of one third the midterm of two years, or eight months. The court imposed consecutive midterm sentences on all of Rivera's convictions other than the principal count. We think it clear the court intended to impose an authorized sentence on Rivera of one third the midterm of two years, or eight months. (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1469, 1472-1473 [where reviewing court can clearly determine the court's intent, it may order modification of the sentence without remand].) Therefore, we will direct the court to modify the minute order dated April 11, 2011, and the abstract of judgment, to reflect the imposition of a consecutive term of eight months, one third the midterm of two years, with respect to Rivera on count 34.

F.     RIVERA: CORRECTION OF CUSTODY CREDITS AND DATE OF CONVICTION

Rivera contends the abstract of judgment fails to reflect the court's award of custody credits, and incorrectly states the date of his conviction for each of his offenses. He requests the abstract of judgment be corrected to accurately reflect the court's judgment and the date of his convictions. The People fail to respond. We agree with Rivera and shall direct the superior court to correct the abstract of judgment to accurately reflect the award of custody credits and the date of his convictions.

"It is well settled that '[a]n abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize. [Citation.]' [Citation.] When an abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, [a reviewing] court has the inherent power to correct such clerical

error on appeal, whether on our own motion or upon application of the parties. [Citation.] We [may] therefore order that the abstract of judgment be corrected to conform to the actual sentence imposed by the trial court . . . ." (*People v. Jones* (2012) 54 Cal.4th 1, 89.)

The court awarded Rivera 604 days of actual and 90 days of conduct credit for a total of 694 days of custody credit. The abstract of judgment for Rivera does not reflect the award of any custody credit. We shall therefore direct the superior court to correct the abstract of judgment to reflect the award of 694 days of custody credit consisting of 604 days of actual credit and 90 days of conduct credit.

The abstract of judgment also incorrectly reflects that the jury convicted Rivera on April 12, 2011. The jury actually convicted Rivera on April 11, 2011. Thus, we shall also direct the superior court to correct the abstract of judgment to reflect Rivera's conviction date as April 11, 2011.

**DISPOSITION**

The superior court is directed to modify the minute order dated June 2, 2011, and the abstract of judgment with respect to defendant Rivera to reflect the imposition of a consecutive term of eight months, one third the midterm of two years, on count 34. This would result in an aggregate sentence of 86 years, 4 months. The superior court is additionally directed to correct the abstract of judgment with respect to defendant Rivera to reflect the award of 604 days of actual and 90 days of conduct credit, for a total award of 694 days of custody credit. Furthermore, the superior court is directed to correct the abstract of judgment with respect to defendant Rivera to reflect a conviction date of April

28

11, 2011. The modified and corrected abstract of judgment and minute order shall be

forwarded to the Department of Corrections and Rehabilitation. In all other respects, the

judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:

KING

Acting P. J.

CODRINGTON

J.